UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| EXPRESS SCRIPTS, INC., and EXPRESS SCRIPTS HOLDING COMPANY, ) | |
| Plaintiffs, ) | |
| v. ) | Case No. 4:21CV737 HEA |
| UNITED STATES OF AMERICA, ) | |
| Defendant. ) | |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment, [Doc. No.88]. Plaintiffs oppose the Motion. For the reasons set forth below, the Motion will be granted.

### Facts and Background

Plaintiffs brought these consolidated actions pursuant to 26 U.S.C. § 7422 for a refund of federal income taxes for the years 2010, 2011, and 2012. Plaintiffs allege they properly claimed the Domestic Production Activities Deduction pursuant to 26 U.S.C. §199 which was in effect during 2010, 2011, and 2012.

Plaintiffs Express Scripts, Inc., and Express Scripts Holding Company (collectively, "Express Scripts") were headquartered in St. Louis, Missouri. Express Scripts Holding Company was formed by the merger of Express Scripts, Inc., and Medco Health Solutions, Inc. ("Medco"), on April 2, 2012. (Plaintiff Ex.

22, 2012 10-K, ESI-00000163 at '166.)

Following its merger with Medco, Express Scripts was the largest pharmacy benefit management company ("PBM") in the United States and held over 40% of the market for PBM services. (Def. Ex. 22, 2012 10-K, ESI-00000163 at '166; Ex. 46, Federal Trade Commission Statement Concerning the Proposed Acquisition of Medco Health Solutions, at p. 1.)

Express Scripts' customers, Plan Sponsors, were various entities that sponsored pharmacy benefit plans ("plan sponsors"), including health insurers, employers, labor unions, managed care organizations, third-party administrators, government health programs. (Def. Ex. 22, 2012 10-K, ESI-00000163 at '166.), and workers compensation plans. (Defs. Ex. 20) at ESI-00000297; Ex. 4, ESI-00000052 at 55.)

Plan Sponsors provided prescription benefits to individuals who received prescription drug benefits through their employer, health plan, or directly through Medicare Part D ("Plan Members"). (Id.)

Pharmacy benefit plans (also called "prescription drug benefit plans") are plans that cover their members' ("plan members") use of prescription drugs. (See Ex. 6, Express Scripts' Fourth Supplemental Response to the United States' Interrogatories, Interrogatory #1.)

Express Scripts brought these consolidated lawsuits claiming that it qualified

for the former Domestic Production Activities Deduction under former 26 U.S.C. § 199 because it derived receipts (i.e., revenue) from either (1) a license or other disposition of certain claims adjudication software it developed (the "Software"); or (2) providing its customers with access to that Software for their direct use. (Plaintiff's Complaint.) Express Scripts asserts in its complaints that it earned domestic production gross receipts, ("DPGR"), and qualified production activities income ("QPAI") in the estimated amounts of for 2010-2012:

2010, claimed DPGR: 2010 $ 22,007 million; 2011: $22,434 million; 2012: $58,071 million Claimed QPA: 2010: $571 million; 2011: $768 million;  2012: $1,083 million.

Express Scripts initiated its refund claims with an informal request for refund. It subsequently engaged with the IRS in a years-long administrative refund claim process which involved numerous meetings and written submissions to the IRS, including memoranda, formal protests, and other correspondence, as well as an amended federal income tax returns submitted to the IRS. (See, e.g., ECF 85-24 (Defs. Ex. 23); Ex. 1, USA-0001713; Ex. 2, USA-0000230; Ex. 3, USA-0000631.)

Express Scripts has described itself as a "full-service PBM" and said in a recent court filing that its "business is providing services to plan sponsors that lower the cost of providing prescription drug benefits." (Ex. 23, Memo from John

Mimlitz to IRS, ESI-00004900 at '900; Ex. 47, Complaint in Express Scripts, Inc. v. Federal Trade Commission, Dkt. 1 ¶ 93, No. 4:24-cv-01263 (E.D. Mo. 2024).) Additionally the 2010, 2011, and 2012 Forms 10-K describe Express Scripts as "one of the largest PBMs in North America" or "the largest PBM company", (ECF 85-25 (Defs. Ex. 21) at ESI-000000055; ECF 85-24 (Defs. Ex. 20) at ESI-00000297; ECF 85-26 (Defs. Ex. 22) at ESI-00000166), and the 2010 and 2011 Company Overview sections list "electronic claims processing and drug utilization review" as one of the primary services provided by the PBM segment, (ECF 85-25 (Defs. Ex. 21) at ESI-00000056; ECF 85-24 (Defs. Ex. 20) at ESI-00000297). In 2012, electronic claims processing is described under drug utilization review. (ECF 85-26 (Defs. Ex. 22) at ESI-00000169;

Express Scripts had contractual relationships with over 67,000 chain and independent retail pharmacies, representing over 95% of all retail pharmacies in the United States. (Def. Ex. 22, 2012 10-K, ESI-00000163 at '167-'168; Ex. 11, Neville Dep. at 136:11-16.)

Express Scripts negotiated the prices of drugs dispensed through those pharmacies on behalf of the many plans it managed. Express Scripts negotiates the prices it pays retail pharmacies on behalf of itself. Plan Sponsors may receive the benefit of that discounted pricing but the prices paid by Plan Sponsors are separately negotiated.

Express Scripts consulted with plan sponsors on how their benefit plans should be designed. (Def. Ex. 22, 2012 10-K, ESI-00000163 at '168.) Plan Sponsors ultimately decided how their plan benefit should be designed. (Ex. 5, Asif Ally Dep. Tr. (Aug. 2, 2024) ("Ally Dep.") at 57:3-14, 105:6-12, 121:7-15; Ex. 4, Neville Dep. at 29:22-30:3.)

One of the benefit design options Express Scripts offered to clients was formularies. (Def. Ex. 22, 2012 10-K, ESI-00000163 at '168-'169.) A formulary is a tiered list of drugs covered by a benefit.(Def. Ex. 22, 2012 10-K, ESI-00000163 at '169; Ex. 11, Neville Dep. at 112:9-115:11; 58:17-60:13.)

Express Scripts developed three or four standard formularies that most of its clients used, and also consulted with other clients to design and implement over one hundred custom formularies. (Def. Ex. 11, Neville Dep. at 62:12-21.)

Express Scripts also offered consulting and financial modeling related to plan design features other than formularies, such as member co-pays, deductibles, annual benefit maximums, and incentives to use generic drugs. (Def. Ex. 22, 2012 10-K, ESI-00000163 at '168.)

Express Scripts contracted with drug manufacturers for payments of "rebates" and "rebate administration fees." (Def. Ex. 11, Neville Dep. at 118:20-119:13.) Express Scripts also contracted with Plan Sponsors for the amount of such rebates and rebate administration fees that Express Scripts would retain and the

amount that Express Scripts would pass through to Plan Sponsors. (e.g., ECF 85-59 (Defs. Ex. 55) at ESI-05940030; Ex. 8, Matthew Dietrich Dep. Tr. (Mar. 5, 2024) ("Dietrich Dep.") at 142:4-19; Response to ¶ 112, infra.) Manufacturers pay rebates and rebate administration fees only after claims are adjudicated and purchase the drugs offered by that manufacturer. (Def. Ex. 4, Neville Dep. at 118:20-119-30; Ex. 9, Benjamin Abney Dep. Tr. (Sept. 28, 2023) ("Abney Dep.") at 134:11-14; ECF 85-47 (Defs. Ex. 43) at ESI-00203373.) The amounts of the rebates and rebate administration fees depend in part on the formulary the Plan Sponsor agrees to use. (ECF 85-47 (Defs. Ex. 43) at ESI-00203373.) Express Scripts would sometimes pass through to the Plan Sponsor 100 percent of the rebates and rebate administration fees received with respect to drugs purchased by that Plan Sponsor, (e.g. ECF 85-59 (Defs. Ex. 55) at ESI-05940030) and would sometimes pass through a lower percentage. (See, e.g., ECF 85-69 (Defs. Ex. 65) at ESI-05941667, -1672 ("Medco will provide SPONSOR with the greater of (i) 85% for Tier A1 or 87% for Tier A of Total Manufacturer Payments received by Medco based on the dispensing of each manufacturer's drugs under SPONSOR's Program, or (ii) the Guaranteed Total Manufacturer Payments (as defined below). The remaining 15% for Tier A 1 or 13% for Tier A of the Total Manufacturer Payments will be retained by Medco under the Program. . . ."); (ECF 85-79 (Defs. Ex. 75) at ESI-06936702; Ex. 10, ESI-05943653 at -3658 ("ESI contracts for its

6

own account with manufacturers to obtain formulary rebates attributable to the utilization of certain brand drugs and supplies . . . ESI often pays an amount equal to all or a portion of the formulary rebates it receives to a client based on the client's ESI agreement terms."); Ex. 9, Abney Dep. at 136:5-8.)

Express Scripts leveraged the combined purchasing power of the plans it managed to negotiate larger rebate payments from manufacturers. (Def. Ex. 22, 2012 10-K, ESI-00000163 at '166; Ex. 11, Neville Dep. at 112:13-115:11; Ex. 17, Cedergreen Dep. at 47:1-22.)

Express Scripts operated home delivery (or "mail order") pharmacies. (Def. Ex. 22, 2012 10-K, ESI-00000163 at '168.) Express Scripts' home delivery pharmacies purchased drugs from manufacturers and wholesalers on its own account and performed distribution and delivery services to get the drugs to members. (Def. Ex. 22, 2012 10-K, ESI-00000163 at '168; Ex. 8, Abney Dep. at 125:13-17; Ex. 11, Neville Dep. at 125:23-126:12.)

Claims adjudication includes, among other things, determining whether a drug prescribed to a member is covered by the member's plan, and, if so, what the financial terms of that coverage are. (Def. Ex. 22, 2012 10-K, ESI-00000163 at '168.)

Since approximately the early 1990s, nearly all claims have been submitted Electronically.

The claims relevant to this litigation were either (1) submitted by retail pharmacists on behalf of plan members when the members presented prescriptions to be filled, or (2) initiated by members themselves, or the members' healthcare providers, when they presented prescriptions to Express Scripts' mail order pharmacies. (Def. Ex. 6, Express Scripts' Fourth Supplemental Response to the United States' Interrogatories, Interrogatory #1.)

The retail and mail-order pharmacists who received the prescription entered information from the prescription and the member's benefit card into their computer systems, which sent a claim for adjudication. (Ex. 6, Express Scripts' Fourth Supplemental Response to the United States' Interrogatories, Interrogatory #1; Ex. 7, Haley 30(b)(6) Dep. at 177:2-10.)

Express Scripts' computer system processed the claim and issued an electronic response to the pharmacy within seconds, as described further below. (Def. Ex. 6, Express Scripts' Fourth Supplemental Response to the United States' Interrogatories, Interrogatory #1.)

Express Scripts contends that its claims adjudication software ("the Software") constituted qualifying production property under 26 U.S.C. 199. (ECF 1¶ 21.) The Government contends the Software constitutes a service, not qualifying production property.

The Software performed a series of actions to adjudicate a submitted claim,

8

including (1) validating the claim to see if any required information was missing or improperly formatted; (2) checking the member's eligibility for benefits under the applicable health benefit plan and any conditions or limitations on coverage; (3) checking if the prescribed drug was on the member's formulary or if an on-formulary drug could be substituted; (4) performing a concurrent drug utilization review and alerting the pharmacist to possible drug interactions and reactions or other indications of inappropriate prescription drug usage; (5) if the claim was approved, confirming to the pharmacy that it would receive payment for the drug dispensed according to its provider agreement with Express Scripts; and (6) informing the pharmacy of the co-payment amount to be collected from the member based upon the client's plan design and the remaining payable amount due to the pharmacy. (Def. Ex. 5, Express Scripts' Response to the United States' Second Set of Interrogatories, Interrogatory No. 11; Ex. 22, 2012 10-K, ESI-00000163 at '168; Wales Dep. at 86:1-5; Ex. 23, Mimlitz Memo, ESI-00004900 at '902-903.)

The Software performed a sequence of actions using "rules based" programming to perform the claims adjudication process. (Def. Ex. 49, Kelley Elliott Dep. Tr. (Nov. 7, 2023) ("Elliott Dep.") at 64:2-9; Ex. 4, Neville Dep. at 168:13-15, 189:21-23; Ex. 15, Wales Dep. at 131:12-15.) The "rules based" design involved instructions for the computer to verify the Plan Sponsor's Plan Members

and formularies for drug coverage, drug pricing, potential for adverse drug interactions, and other information by referencing tables or databases. (Def. Ex. 4, Neville Dep. at 313:18-19 ("It's adjudicated on a system of rules."); Def. Ex. 15, Wales Dep. at 131:12-17; Def. Ex. 24, Neville Decl. at ¶ 7.)

The Software consisted of programs or routines or sequences of machine-readable code that were designed to cause computers to perform desired functions and/or sets of functions. (Def. Ex. 14, Senden Dep. at 117:16-120:5; Def. Ex. 18, Reichenbacher Dep. at 22:10-13; Def. Ex. 4, Neville Dep. at 313:18-19; ECF 85-36 (Defs. Ex. 32) at ESI-00336469-6473, -6478-6479; Def. Ex. 50, Declaration of Scott Senden (June 17, 2024) ("Senden Decl.") at ¶ 3; Def. Ex. 16, Cohen Report at ¶¶ 8, 9, 11, 17, 28-33.)

The Software performed claims adjudication independently and in its entirety. (Def. Ex. 5, Ally Dep. at 92:1-2 ("the software itself is the claims processing. So the claims processing is the software"); Ex. 14, Senden Dep. at 36:20-25; Def. Ex. 18, Reichenbacher Dep. at 212:22-213:8

If a claim lacked the pre-approval required under the plan, the Software rejected the claim, thus ending the adjudication. (Def. Ex. 15, Wales Dep. at 258:16-20; see also Def. Ex. 9, Abney Dep. at 20:8-22.)

The Software referenced some data to adjudicate and process the submitted Claims. Some of the data that the Software referenced was provided by

Plan Sponsors, some of it was provided by third-parties, some of it was provided by Plan Members, and some of it was generated by the Software in the process of adjudicating and processing the submitted Claims. (Def. Ex. 4, Neville Dep. at 313:14-22; Ex. 51, Declaration of Asif (AJ) Ally (June 19, 2024) ("Ally Decl.") ¶ 5; Def. Ex. 50, Senden Decl. ¶ 4.)

The Software referenced pricing data that was publicly available from First DataBank. (Def. Ex. 14, Senden Dep. at 87:10-11; Def. Ex. 51, Ally Decl. ¶ 6; Def. Ex. 50, Senden Decl. ¶ 4.)

In adjudicating the claim, Plan Sponsors cannot access the data in the databases. (See Def. Ex. 14, Senden Dep.at 124:12-25.

Express Scripts offered a call center service that allowed the Plan Member or pharmacist to call and discuss the rejected claim with a live person. (Def. Ex. 4, Neville Dep. at 274:8-12; see also Def. Ex. 15, Wales Dep. 26:15-27:3.) Call center employees did not adjudicate claims, and the call center discussions were not part of the claims adjudication process for which this deduction is sought. (Def. Ex. 12, Haley 30(b)(6) Dep. at 166:5-8; Def. Ex. 4, Neville Dep. at 246:2-20, 275:2-13; ECF 85-59 (Defs. Ex. 55) at ESI-05940015; see also Ex. 16, Cohen Report at ¶ 42.)

Prior to permitting retail pharmacies to submit claims, Express Scripts required them to test the software and connectivity through which they submitted

claims and to obtain a software vendor certification number. (Def. Ex. 44, PriceWaterhouseCoopers Report on Medco's Pharmacy Claims and Billing Systems, ESI-00029084 at '115-'116.) Express Scripts also required pharmacies in its networks to pass license, insurance, and quality assurance checks, and to consent to periodic audits. (Def. Ex. 31, Network Provider Manual, ESI-00004445 at '453, '481.)

Claims consisted of certain member, prescriber, and prescription information in an industry-standard format established by the National Council for Prescription Drug Programs ("NCPDP"). (Def. Ex. 22, 2012 10-K, ESI-00000163 at '168; Ex. 12, Ram Dep. at 99:6-16; Ex. 16, Wales Dep. at 81:18-21. In technical terms, pharmacies submitted claims electronically in a variable-length format, which consisted of alphanumeric characters grouped into specific segments corresponding to categories of information, such as identifying information about the member and type of drug. (Ex. 12, Ram Dep. at 94:20-99:5.) Pharmacies submitted claims to "switching companies." (Def. Ex. 16, Wales Dep. at 84:1-5.; Ex. 23, Mimlitz Memo, ESI-00004900 at '903.)

The switch plays a critical role in being able to aggregate the connectivity around the country. (Def. Ex. 14, Senden Dep. at 133:8-12.) Switching companies were responsible for routing claims to the appropriate PBM. (Def. Ex. 12, Ram Dep. at 34:22-35:11) Express Scripts paid switching companies for their service.

If the Software determined that the claim was covered, the response would indicate the agreed price for the drug under the specific agreement with the pharmacy. (Def. Ex. 11, Neville Dep. at 130:4-10, Def. Ex. 4, Neville Dep. at 130:4-10.)

According to the Fifth Amendment to the Standard Licensing Agreement between First Databank and ESI, in 2010, for claims processing and adjudication, ESI agreed to pay an annual base fee of $282,200 for up to 26 million claims per month, as well as a volume fee of $0.008 per claim for each additional claim processed in the month (above the 26 million threshold). (Def. Ex. 17, Cohen Rebuttal Report ¶¶ 40-41 (citing ESI-C-00296706 to 710 at 709 (detailing fees Express Scripts agreed to pay to First Databank)) and ESI-00005457 (calculating total IT spend related to implantation of the Software).) The First Databank data was available for purchase on the open market. (C.f. Def. Ex. 14, Senden Dep. at 87:5-12 )

Express Scripts received gross receipts from the Plan Sponsors. Mr. Haley testified that clients pay to use the Software when a claim is adjudicated. (Def. Ex. 12, Haley 30(b)(6) Dep. at 116:2-9.)  Mr. Haley also testified that "the PBM agreement says that when a claim is adjudicated the client pays us certain amounts as dictated by that agreement." (Id. at 116:18-20.)

The PBM Agreements provide that Plan Sponsors paid Express Scripts an

13

"administrative fee" for claims processing services and other administrative services. (Def. Ex. 55, 7-Eleven Agreement, ESI-05940009 at '013; Def. Ex. 60, Emblem Health Agreement, ESI-05939527 at '535; Def. Ex. 63, Wells Fargo Agreement, ESI-05940812 at '818; Def. Ex. 64, White Castle Agreement, ESI-05940968 at '972; Def. Ex. 76, BB&T Agreement, ESI-05940640 at '644; Def. Ex. 58, BCBS of Louisiana Agreement, ESI-06932791 at '852; Def. Ex. 65, Art Institute of Chicago Agreement, ESI-05941663 at '689; Def. Ex. 66, Steamfitters Agreement, ESI-05941774 at '792; Def. Ex. 78, NCR Agreement, ESI-05944914 at '932.

Express Scripts owned "mail order" pharmacies from which members could request home delivery of prescribed drugs. (Ex. 22, 2012 10-K, ESI-00000163 at '168.) Members could seek to have new prescriptions filled at Express Scripts' mail order pharmacies by providing, or having their doctor provide, their prescription and plan information to an Express Scripts pharmacist. (Def. Ex. 6, Express Scripts' Fourth Supplemental Response to the United States' Interrogatories, Interrogatory #1; Ex. 8, Abney Dep. at 199:19-200:8.) Express Scripts' pharmacy personnel would then manually type out data about the member and the prescription, or it would be sent by e-script, to submit a claim for adjudication. (Def. Ex. 6, Express Scripts' Fourth Supplemental Response to the United States' Interrogatories, Interrogatory #1; Ex. 8, Abney Dep. at 199:19-

200:8.)

Members whose prescriptions authorized them to obtain refills could submit claims for those refills through Express Scripts' website. (Def. Ex. 6, Express Scripts' Fourth Supplemental Response to the United States' Interrogatories, Interrogatory #1; Ex. 8, Abney Dep. at 199:19-200:8.; Ex. 12, Ram Dep. at 67:1-17.) Refill claims that members submitted through the website were converted into NCPDP format by software at the mail order pharmacy. (Ex. 12, Ram Dep. at 100:3-19; Ex. 10, McLaughlin Dep. at 24:3-9.)

Certain refill requests made through Express Scripts' website were routed through switching companies to fulfill compliance requirements; for example, the government's tracking of the use of experimental drugs. (Ex. 12, Ram Dep. at 102:18-103:22.)

The Software would reject claims when, for example, the claim file contained improperly formatted fields (like date of birth), a prescribed drug was off formulary, a prescribed drug exposed a plan member to a harmful interaction with another prescribed drug according to Express Scripts' clinical data, a prescribed drug required a "prior authorization" from the plan sponsor, a prescribed drug was subject to a "step therapy" requirement whereby the member needed to try another (typically less expensive) drug first, or the member had attempted to fill the same prescription at multiple pharmacies. (Def. Ex. 16, Wales Dep. at 86:1-14, 144:9-

17, 167:6-168:14; 169:8-19, 177:8-178:16; Ex. 13, Reichenbacher Dep. at 117:5-118:11, Ex. 23, Mimlitz Memo, ESI-00004900 at '902-903.)

After consulting with plan members, sponsors, or physicians (as necessary), pharmacists might be able to change some aspect of a rejected claim, submit it as a new claim, and obtain Software approval of the claim. (Def. Ex. 16, Wales Dep. at 148:1-149:5, 258:11-22; Ex.-13, Reichenbacher Dep. at 118:12-120:6, 155:15-156:21.)

Express Scripts did not give plan sponsors or plan members usernames and passwords to access the Software. (Def. Ex. 12, Ram Dep. at 218:2-219:8; Ex. 32, Ernst & Young Description of Express Scripts, Inc.'s Pharmacy Claims and Rebate Processing Systems, ESI-00336455 at '469-'471; Def. Ex. 2, Second RFAs, RFA #142.)

Plan sponsors did not have the right to view the code that comprised the Software. (Def. Ex. 2, Second RFAs, RFA #142.)

Express Scripts never provided a copy of the Software, or transferred the Software, to a plan sponsor. (Def. Ex. 3, Third RFAs, RFA #240, 241.)

Neither plan sponsors, plan members, nor pharmacists could use the Software to look up information or compile reports. (Ex. 7, Haley 30(b)(6) Dep. at 176:13-177:10.)

Plan sponsors did not submit claims to the Software themselves. (Def. Ex.

16

24, October 5, 2015 Presentation, ESI-00048348 at '353; Ex. 23, Mimlitz Memo, ESI-0000490.)

Some of Express Scripts' contracts with plan sponsors expressly prohibited the plan sponsors from accessing the Software. (Def. Ex. 70, Contract with Exelon Corp., ESI-05944859 at '868; Def. Ex. 55, Contract with 7-Eleven, Inc., ESI-05940009, at '017; Def. Ex. 59, Contract with Toyota Motor Sales USA, Inc., ESI-05944945 at ' 967.)

First Databank was a third-party company from which Express Scripts purchased data on drug pricing, as well as "NDC" codes that uniquely identified drugs and provided information such as how many pills were in a bottle, how many milliliters were in a vial, and what kind of syringe accompanied an injectable drug. (Def. Ex. 11, Neville Dep. at 100:9-24.)

According to the Fifth Amendment to the Standard Licensing Agreement between First Databank and ESI, in 2010, for claims processing and adjudication, ESI agreed to pay an annual base fee of $282,200 for up to 26 million claims per month, as well as a volume fee of $0.008 per claim for each additional claim processed in the month (above the 26 million threshold). (Def. Ex. 17, Cohen Rebuttal Report ¶¶ 40-41 (citing ESI-C-00296706 to 710 at 709 (detailing fees Express Scripts agreed to pay to First Databank)) and ESI-00005457 (calculating total IT spend related to implantation of the Software).) The First Databank data

was available for purchase on the open market. (C.f. Def. Ex. 14, Senden Dep. at 87:5-12.)

Express Scripts did not separately charge clients for updating the data. (Def. Ex. 7, Haley 30(b)(6) Dep. at 78:21-79:4.)

Express Scripts' contracts with retail pharmacies typically called for Express Scripts to pay two types of fees for any medications the pharmacies agreed to dispense to plan members: an "ingredient fee," defined as a percentage discount off of an industry-standard benchmark rate called Average Wholesale Price, and a "dispensing fee" for the services the pharmacy provided in dispensing the drug. (Def. Ex. 11, Neville Dep. at 127:22-130:10; Ex. 28, Cedergreen Aff. ¶ 42.)

Average Wholesale Price ("AWP") was an industry-standard benchmark price published by third-party data firms such as First Databank. (Def. Ex. 11, Neville Dep. at 130:11-131:7.) AWP was typically defined as 20% above another industry benchmark price called Wholesale Acquisition Cost. (Def. Ex. 11, Neville Dep. at 50:3-11; 128:13- 21.) Wholesale Acquisition Cost was set by the "list prices" manufacturers reported charging wholesalers for their drugs. (Def. Ex. 11, Neville Dep. at 49:6-9.)

The ingredient costs and dispensing fees Express Scripts paid to retail pharmacies were referred to as "reimbursement" payments for the pharmacies' costs in dispensing drugs to members without full upfront payment. (See Def. Ex.

11, Neville Dep. at 130:1-10, 85:23-24; Def. Ex. 18, Dietrich Dep. at 49:11-18.)

Express Scripts' contracts with plan sponsors typically called for plan sponsors to pay Express Scripts three main types of fees in connection with each drug dispensed to a member through a retail or mail-order pharmacy: an ingredient cost, a dispensing fee, and an administrative (or "administration") fee. (Def. Ex. 20, 2010 10-K, ESI-00000293 at '362.)

The majority of Express Scripts' contracts with plan sponsors defined claims adjudication (or "electronic claims processing") as a service that Express Scripts provided at "no additional fee." (Def. Ex. 55, Contract with 7-Eleven, Inc., ESI-05940009 at '026; Def. Ex. 58, Contract with Blue Cross and Blue Shield of Louisiana, ESI-06932791 at '852; Def. Ex. 61, Contract with Crown Equipment Corp., ESI- 05940689 at '713; Def. Ex. 70, Contract with Exelon Corp., ESI-05945034 at '058; Def. Ex. 57, Contract with The Hershey Company, ESI-06932710 at '729; Def. Ex. 75, Contract with Maximus, Inc., ESI-06936673 at '697; Def. Ex. 59, Contract with Toyota Motor Sales USA, Inc., ESI-05944945 at '994; Def. Ex. 64, Contract with White Castle System, Inc., ESI-05940968 at '993; Def. Ex. 62, Contract with J.C. Penney Corporation, Inc., ESI- 05940731, at '768; Def. Ex. 73, Contract with Plumbers Local 12 Health and Welfare Fund, ESI-06932626 at '657; Def. Ex. 72, Contract with Ohio Public Employees Retirement System Health Plan, ESI-05945279 at '303; Def. Ex. 76, Contract with BB&T

Corporation, ESI-05940640 at '658; Def. Ex. 69, Contract with Blue Cross and Blue Shield of Vermont, ESI-05944577 at '662; Def. Ex. 63, Contract with Wells Fargo Insurance Services USA, Inc. ESI-05940812 at ' 853; Def. Ex. 77, Contract with UPMC Health Plan, Inc., ESI-05943347 at '404; Def. Ex. 18, Dietrich Dep. at 72:13-17.) Some of the contracts include a chart of Administrative Services and Clinical Fees or similar, which provides a list of items including a number of items with separately stated fees.

Many of Express Scripts' contracts with plan sponsors listed the amount of the overall administrative fee as $0.00. (Def. Ex. 55, Contract with 7-Eleven, Inc., ESI-05940009, at '023; Def. Ex. 58, Contract with Blue Cross and Blue Shield of Louisiana, ESI-06932791 at '828 & '832; Def. Ex.61, Contract with Crown Equipment Corp., ESI-05940689 at '702; Def. Ex. 57, Contract with The Hershey Company, ESI-06932710 at '726; Def. Ex. 75, Contract with Maximus, Inc., ESI-06936673 at '691; Def. Ex. 56, Contract with Toyota Motor Sales USA, Inc., ESI-05944945 at ' 981 & '982); Def. Ex. 64, Contract with White Castle System, Inc., ESI-05940968 at '983; Ex. 76, Contract with BB&T Corporation, ESI-05940640 at '655; Ex. 63, Contract with Wells Fargo Insurance Services USA, Inc. ESI-05940812 at ' 839; Def. Ex. 77, Contract with UPMC Health Plan, Inc., ESI-05943347 at '382-'383; Def. Ex. 65, Contract with The Art Institute of Chicago, ESI-05941663 at '689; Def. Ex. 66, Contract with Steamfitters Industry Welfare

Fund, ESI-05941774, at '792; Ex. 71, Contract with Bingham McCutchen LLP, ESI-05945076 at '104); Ex. 74, Contract with Ford Motor Company, ESI-0693553, at '583.

Some contracts listed claims adjudication as a type of administrative service paid for by an administrative fee that was set above $0.00, but expressly stated that claims adjudication was provided at no additional fee. (Def. Ex. 70, Contract with Exelon Corp., ESI-05945034 at '058 & '049 (administrative fees of $0.65 to $0.90 for retail claims; $0.00 for mail claims); Def. Ex. 69, Contract with Blue Cross and Blue Shield of Vermont, ESI-05944577 at '637-'643 (various administrative fees).

Some contracts listed claims adjudication as a type of administrative service compensated by an administrative fee above $0.00, and did not expressly state that claims adjudication was provided at no additional fee. (Def. Ex. 67, Contract with Blue Cross Blue Shield of Michigan, ESI-05941807 at '849 (charging administrative fee of up to $0.09 per paid claim); Def. Ex. 68 Contract with WellPoint, Inc., ESI-05943660 at '720 (administrative fee of $0.30 per paid retail claim); Def. Ex. 60, Contract with Emblem Health, ESI-05939527 at '577 (charging administrative fee of up to $1.25 per paid claim); Def. Ex. 78, Contract with NCR Corporation, ESI-05944914 at '932 (charging base administrative fee of $1.25 per paid claim).)

Express Scripts' selected subset of contracts to which the parties have agreed

with plan sponsors all referred to claims processing and/or claims adjudication as a

"service" that Express Scripts itself was obligated to provide. (Def. Ex. 55,

Contract with 7-Eleven, Inc., ESI-05940009 at '013 ("ESI will perform claims

processing services for Covered Drugs dispensed by Participating Pharmacies,

Mail Service, and CuraScript"); Def. Ex. 58, Contract with Blue Cross and Blue

Shield of Louisiana, ESI-06932791 at 800, '852; Def. Ex. 61, Contract with Crown

Equipment Corp., ESI-05940689 at '692, '713; Def. Ex. 70, Contract with Exelon

Corp., ESI-05945034 at '038, '058; Def. Ex. 57, Contract with The Hershey

Company, ESI-06932710 at '714, '729; Def. Ex. 75, Contract with Maximus, Inc.,

ESI- 06936673 at '678, '697; Def. Ex. 59, Contract with Toyota Motor Sales USA,

Inc., ESI- 05944945 at '955, '994; Def. Ex. 64, Contract with White Castle

System, Inc., ESI-05940968 at '972, '993; Def. Ex. 62, Contract with J.C. Penney

Corporation, Inc., ESI-05940731, at '768; Def. Ex. 73, Contract with Plumbers

Local 12 Health and Welfare Fund, ESI-06932626 at '657; Def. Ex. 72, Contract

with Ohio Public Employees Retirement System Health Plan, ESI-05945279 at

'303; Def. Ex. 76, Contract with BB&T Corporation, ESI-05940640 at '658; Def.

Ex. 69, Contract with Blue Cross and Blue Shield of Vermont, ESI-05944577 at

'662; Def. Ex. 63, Contract with Wells Fargo Insurance Services USA, Inc. ESI-

05940812 at ' 853; Def. Ex. 77, Contract with UPMC Health Plan, Inc., ESI-

05943347 at '404; Def. Ex. 65, Contract with The Art Institute of Chicago, ESI-

05941663 at '689; Def. Ex. 66, Contract with Steamfitters Industry Welfare Fund, ESI-05941774, at '791-792, Def. Ex. 68, Contract with Wellpoint, Inc., ESI-005943660 at ''680.)

The Wellpoint, Inc. Contract required Express Scripts to perform its administrative services "in a prudent and expert manner." (Ex. 68, Contract with Wellpoint, Inc., ESI-005943660 at '674.)

Claims processing must be in compliance with rules imposed by the Employee Retirement Income Security Act ("ERISA"). A notice of an adverse benefit determination within a reasonable period of time must be given, but not less than 90 days after the receipt of the claim by the plan. 29 C.F.R. § 2560.503-1(f)(1); (Ex. 2, RFA #150.)

None of the invoices Express Scripts sent to plan sponsors included a line item specifically for a license of or access to the Software. (Ex. 30, Mimlitz July 2019 letter, ESI-01048318 at '333.) Express Scripts contends that during the tax years at issue, Express Scripts charged Plan Sponsors for all the products and services Express Scripts provided to them, under the PBM Agreements. According to Express Scripts, these charges were reflected as a bundled or undifferentiated fee on the invoice. (Ex. 8, Dietrich Dep. at 112:18-113:24.)

Express Scripts' contracts with drug manufacturers provided that rebate amounts were based on the utilization of the manufacturer's products and its

formulary positioning. (Def. Ex. 43, Preferred Savings Grid Rebate Program Agreement between Express Scripts, Inc. and Accorda Therapeutics, Inc., ESI-00203356 at '373; Ex. 28, Cedergreen Aff. at ¶ 38.) the rebates are paid after an adjudication of the claims and the drugs are purchased. (Def. Ex. 4, Neville Dep. at 118:20-119:13; Ex. 9, Abney Dep. at 134:11-14; ECF 85-47 (Defs. Ex. 43) at ESI-0020373.) The amounts of the rebates and rebate administration fees depend in part on the formulary the Plan Sponsor agrees to use. (Id.) Express Scripts also contracted with Plan Sponsors for the amount of such rebates and rebate administration fees that Express Scripts would retain and the amount that Express Scripts would pass through to its Plan Sponsors. (See, e.g., ECF 85-59 (Defs. Ex. 55); Def. Ex. 8, Dietrich Dep. at 142:4-19.) Express Scripts would sometimes pass through to the Plan Sponsor 100% of the rebates and rebate administration fees received with respect to drugs purchased by that Plan Sponsor, (e.g., ECF 85-59 (Defs. Ex. 55) at ESI-05940030) and would sometimes pass through a lower amount.

The contracts provided that rebate administration fees were paid for the tracking, collection, processing, and reporting of utilization data related to drug manufacturers' products, and the calculation and distribution of applicable payments. (Def. Ex. 43, Preferred Savings Grid Rebate Program Agreement between Express Scripts, Inc. and Accorda Therapeutics, Inc., ESI-00203356 at

'357.)

Express Scripts contends that the qualifying receipts (i.e. DPGR) it earned from the Software were embedded in a "bundled fee" that plan sponsors paid both for the Software and other PBM services. (Def. Ex. 39, Bell Report at 4; Def. Ex. 9, Bell Dep. at 54:8-20, Ex. 38, Deloitte Report at 4.) According to Express Scripts, the "bundled fee" includes the ingredient costs, dispensing fees, and administrative fees paid by plan sponsors, as well as the rebates and rebate administration fees paid by drug manufacturers. (Def. Ex. 39, Bell Report at 4; Ex. 38, Deloitte Report

at 4.)

According to Express Scripts, the "bundled fee" contains the majority of all revenue Express Scripts earned. (Def. Ex. 22, 2012 10-K, ESI-00000163 at '202 (showing total revenue for 2010-2012); Def. Ex. 39, Bell Report at Exhibit E, PDF page #97 (showing claimed bundled fee revenue); Def. Ex. 3, Express Scripts' Responses to United States' Third Requests for Admission, RFA #168.)

Express Scripts did not maintain general ledger accounts or sub- accounts that exclusively contained receipts derived from the Software. (Def. Ex. 19, Voorhees Dep. at 114:1-11.)

To isolate its claimed DPGR from the bundled fee, Express Scripts subtracted (1) "passthrough" payments it made (a) to pharmacies to compensate for

the pharmaceuticals dispensed and the provision of associated dispensing services, and (b) to customers for their negotiated share of rebates and rebate administration fees; and (2) amounts allocable to certain embedded services, which it determined using a transfer pricing approach. (Def. Ex., 39, Bell Report at 4-5; Def. Ex. 38, Deloitte Report at 9-11.) Express Scripts also subtracted receipts attributable to claims adjudicated by other software programs (Wellpoint and Stratus claims). Express Scripts also subtracted amounts allocable to the sale of drugs by the mail order pharmacies. (Def. Ex. 35, Abhijit Jay Das Dep. Tr. (Aug. 14, 2024) ("Das Expert Dep.") at 251:1-10.) The methods used by Express Scripts' experts, Deloitte and Dr. Bell, differed in certain respects.

Express Scripts' claimed DPGR includes receipts from the "spread" between the ingredient costs and dispensing fees it paid to retail pharmacies and the ingredient costs and dispensing fees it received from plan sponsors. (Def. Ex. 15, Voorhees Dep. at 40:13-41:1.)

Express Scripts' claimed DPGR includes receipts from the portion of the rebates and rebate administration fees it received from drug manufacturers and did not pass through to plan sponsors. (Def. Ex. 15, Voorhees Dep. at 40:13-41:1.)

Express Scripts' claimed DPGR includes receipts from the administrative fees it received from plan sponsors. (Def. Ex. 15, Voorhees Dep. at 40:13- 41:1.)

Express Scripts' claimed DPGR includes receipts from its mail order

pharmacies. (Def. Ex. 15, Voorhees Dep. at 40:13-41:1.)

Express Scripts did produce in this litigation a spreadsheet that was "materially accurate" with respect to the total receipts it derived from the ingredient costs, dispensing fees, and administrative fees that Express Scripts, Inc. charged sample pool customers in connection with retail and mail-order claims in 2012. (Exhibit 50 to Abney Dep., Excel File Produced as ESI-06931828; Def. Ex. 8, Abney Dep. at 104:5-18; 120:4-121:5; 129:16-21.) Mr. Abney later testified in response to multiple questions from Defendant, that the totals on Exhibit 50 represented amounts billed to clients "labelled" ingredient costs. (Id. at 137:7-18; 141:8-22; 142:13-22; 143:12-20: 143:21-144:7; 143:8-19; 146:5-12; 146:13-147:4.)

That spreadsheet shows that Express Scripts, Inc. earned $100,048,878.36 from administrative fees paid by sample pool customers in 2012 in connection with drugs dispensed from retail pharmacies. (Def. Ex. 8, Abney Dep. at 148:18-149:2; Ex. 52, Excel File Produced as ESI-06931828 at Sheet ESI 2012, Cell M47.) Mr. Abney testified that the amounts were amounts labelled as administrative fees on invoices and billed to clients as such, not that they were administrative fees earned or paid. (Ex. 9, Abney Dep. at 148:14-149:5.) Mr. Abney also testified only that the amounts were "materially correct." (Id. at 149:6-9.)

The spreadsheet shows that Express Scripts, Inc. earned $2,792,500.79 from

administrative fees paid by sample pool customers in 2012 in connection with drugs dispensed from its mail order pharmacies. (Def. Ex. 52, Excel File Produced as ESI-06931828 at Sheet EMO 2012, Cell M3115.) Mr. Abney testified that the amounts were amounts labelled as administrative fees on invoices and billed to clients as such, not that they were administrative fees earned or paid. (Def. Ex. 9, Abney Dep. at 148:14-149:5.) Mr. Abney also testified only that the amounts were "materially correct." (Id. at 120:4-9.)

The spreadsheet shows that Express Scripts, Inc. earned receipts of $11,636,518,668.84 from what Express Scripts contends was the bundled fee (including ingredient costs, dispensing fees, and administrative fees) from sample pool customers related to retail claims in 2012. (Def. Ex. 52, Excel File Produced as ESI- 06931828 at Sheet ESI 2012, Cell Q47; Def. Ex. 8, Abney Dep. at 150:12-151:9.) Plaintiff contends the spreadsheet shows that Express Scripts, Inc. billed to sample pool customers amounts labelled as ingredient costs (Cell K47), dispensing fees (Cell L47), administrative fees (Cell M47), and taxes (Cell N47) and that the total of those amounts, net of amounts paid by Plan Sponsors' plan members as co-payments (Cell O47), totaled approximately $11.6 million ($11,636,518,668.84 (Cell Q47) adjusted to $11,581,530,014.41 (Cell S47)). Cell citations to ESI-06931828 Sheet ESI 2012. (ECF 85-56 (Defs Ex. 52).) Those amounts are included in the "bundled fee" with respect to sample pool customers but are not the entire

28

bundled fee. Mr. Abney testified that rebates would also be included in the bundled fee. (Id. at 150:12-151:9; see also ECF 85-42 (Defs. Ex. 38) at 11-13; ECF 85-43 (Defs. Ex. 39) at 4, 98.)

The spreadsheet shows that Express Scripts, Inc. passed $10,593,908,982.87 of those receipts through to pharmacies. (Def. Ex. 52, Excel File Produced as ESI-06931828 at Sheet ESI 2012, Cell Q47; Ex. 8, Abney Dep. at 150:12-151:9.) Plaintiff asserts these amounts are amounts billed, not amounts received, and are labelled as ingredient costs, dispensing fees, administrative fees, taxes, less co-payments, and are only materially correct. Mr. Abney testified that these amounts were amounts paid to pharmacies, and did not testify that they were "passed-through." (Def. Ex. 9, Abney Dep. at 150:21-151:5.) Express Scripts does not dispute that $10,593,908,982.87 is shown in ESI-06931828 Sheet ESI 2012 Cell Q47 as the amount paid to pharmacies and that amount is materially correct with respect to retail claims by sample pool customers.

Express Scripts wrote to the IRS: "Express Scripts maintains a network of retail pharmacies that are authorized to access the Platform to submit and process prescription drug claims on behalf of Express Scripts members. Express Scripts also provides direct online access to the Platform to members who wish to use the features and functionality of the Platform themselves to request refills from the Company's mail order dispensing pharmacies." (Def. Ex. 23, Mimlitz Memo,

ESI- 00004900 at '902.)

Express Scripts wrote to the IRS: "A substantial portion of our revenues are generated from third-party use of our internally developed pharmacy claims adjudication software platform…Clients pay us a fee each time the Platform is used by a third party to adjudicate and process a member's claim," and "Third parties that access the online Platform to submit and process claims include: Network pharmacists using the Platform on behalf of members [and] Members using the Platform directly to request refills from our mail-order service." (Def. Ex. 24, October 5, 2015 Slide Deck, ESI-00048348 at '353.)

Express Scripts wrote to the IRS: "Under the PBM agreements ESI enters into with its clients, ESI agrees to make its online claims adjudication software platform (the "Platform") available to third parties for real-time adjudication and processing of members' prescription drug claims. The Platform can be accessed directly by a client's members through the Member Website, or it can be accessed by network pharmacy representatives using the Platform on behalf of the client's members… ESI guarantees the performance of the Platform under standards specified in the PBM agreements relating to accuracy, availability and/or response time of the Platform." (Def. Ex. 25, IDR Response, ESI-00004897 at '897.)

In its Descriptions of Express Scripts, Inc.'s Pharmacy Claims and Rebate Processing Systems, Express Scripts includes to its auditors at Ernst & Young:

"Express Scripts' integrated PBM services include network claims processing, home delivery pharmacy services, specialty prescription fulfillment, benefit design consultation, drug utilization review, formulary management, disease management, and drug data analysis services." (Def. Ex. 32, Ernst & Young Description of Express Scripts, Inc.'s Pharmacy Claims and Rebate Processing Systems, ESI-00336455 at '463.)

Express Scripts admitted in its answer in Anthem, Inc. v. Express Scripts, Inc., No. 16-cv-2048 (S.D.N.Y.), that one of the "pharmacy benefit management services" it provided was "network-pharmacy claims processing." (Ex. 53 ¶ 1; Ex. 54 ¶ 22.). Plaintiff contends this was through "leasing, licensing, renting or otherwise disposing to Plan Sponsors the Software."

Express Scripts stated in its 10-K: "When a prescription is presented by a member to a retail pharmacy within our network, we are solely responsible for confirming member eligibility, performing drug utilization review, reviewing for drug-to-drug interactions, performing clinical intervention, which may involve a call to the member's physician, communicating plan provisions to the pharmacy, directing payment to the pharmacy and billing the client for the amount it is contractually obligated to pay us for the prescription dispensed, as specified within our client contracts." (Def. Ex. 22, 2012 10-K, ESI-00000293 at '362.)

Express Scripts wrote to the IRS: "ESI guarantees the performance of the

31

Platform under standards specified in the PBM agreements relating to accuracy, availability and/or response time of the Platform." (Ex. 25, IDR Response, ESI-00004897, at '897.)

Express Scripts employees Shawn Haley and Jacob Cedergreen averred in affidavits submitted both to the Indiana Tax Court and the Maine Board of Tax Appeals that the ingredient cost, dispensing fee, and administrative fee were derived from "providing PBM services," and not from a license or providing access to the Software. (Ex. 28, Cedergreen Affidavit, at ¶¶ 40-41; Ex. 27, Haley Affidavit, at ¶¶ 10-11; Ex. 29, Haley Affidavit, at ¶¶ 5-6.)

At issue in that case was "whether Express Scripts, a pharmacy benefit management company, receives its Indiana income from the retail sale of prescription drugs or from the provision of services." Express Scripts Inc. v. Indiana Dep't of State Revenue, 170 N.E.3d 273, 274–75 (Ind. T.C. 2021).

Jacob Cedergreen, Express Scripts' former Vice President of Product Management, testified that "the revenue Express Scripts received from ingredient fees, dispensing fees, and administrative fees they charged customers was derived from providing PBM services to its clients." (Def. Ex. 17, Cedergreen Dep. at 36:1-9.) After objection, Mr. Cedergreen testified "I believe so" in response to a question asking "you would agree" to the quote above.

Jacob Cedergreen testified that "Express Scripts used the adjudication

platform in fulfilling its contractual obligation to provide [claims processing] services." (Def. Ex. 17, Cedergreen Dep. at 34:12-14.) He testified "I believe so" in response to a question asking "correct?" after the quote above.

Jacob Cedergreen testified that Express Scripts' claims adjudication platform was not "something that differentiated Express Scripts from its competitors." (Ex. 17, Cedergreen Dep.at 42:5-13.)

Matthew Dietrich, Express Scripts' Senior Director of Client Pricing, testified that he participated in "probably a thousand" negotiations with clients and couldn't "recall a specific client where the platform was a specific differentiator." (Def. Ex. 18, Dietrich Dep. at 56:21-59:1.)

Everett Neville, Express Scripts' former Vice President of Pharma Strategies and currently an Executive Vice President of Strategy at Express Scripts' parent company, Cigna, testified that the main sources of Express Scripts' profits during the 2010-12 period "would have been the retail spread and rebates … those by far would have been the largest followed by home delivery and specialty." (Def. Ex. 11, Neville Dep. at 158:18-159:2.) Everett Neville testified: "We made money in retail spread, we made money [in] specialty, we made money in home delivery, we made money in rebates. Everything else was diminimis. The fees we got for clinical programs and that kind of thing were relatively small. I've seen all the contracts before. There's rarely a very big number in anything else. But individual

contracts might have zero dollars in retail and a lot in rebates or vice-versa. There may be very little in home delivery and a lot in specialty or vice-versa. There weren't any other places we made substantial amounts of money in contracts." (Neville Dep. at 162:12-23.) Neville specifically testified that Express Scripts primarily derived revenue "by processing the claims." (Def. Ex. 4, Neville Dep. at 41:12-19; see also id. at 82:19-83:2.)

Harry Ram, an Express Scripts Director with dozens of years of experience with the Software, testified: "Nobody directly accesses this Platform." (Def. Ex. 12, Ram Dep. at 218:2-15.)

William McLaughlin, a former Express Scripts Vice President with responsibility for the Software, testified that the databases the Software relied on were a "critical part of the overall adjudication process" and "adjudication couldn't happen without them." (Ex. 10, McLaughlin Dep. at 111:15-20.) Scott Senden, who testified that he saw the data as critical. (Def. Ex. 14, Senden Dep. at 115:18-116:2.)

Express Scripts admitted that "to the extent it capitalized the costs of the Software, [Express Scripts] accounted for such costs under internal policies consistent with the rules of FASB ASC 350-40 on the consolidated balance sheets on the Forms 10-K that [it] filed with the SEC for the tax years at issue." (ECF 85-5 (Defs. Ex. 1), RFA #72.) Plaintiff admitted that FASB ASC 350-40, as in effect

during the tax years at issue, "stated, in part, that 'internal-use software has both of the following characteristics: a. The software is acquired, internally developed, or modified solely to meet the entity's internal needs. b. During the software's development or modification, no substantive plan exists or is being developed to market the software externally.'" (Id., RFA #73.)

Express Scripts identified Mr. Everett Neville as a witness with knowledge of the PBM business. (Def. Ex. 48, Rule 26 Disclosures.) Mr. Neville was Express Scripts' Vice-President of Pharma Strategies beginning in approximately 2009

Benjamin Abney is currently, the Tax Director within The Cigna Group, which owns Express Scripts, Inc. and Evernorth Health, Inc. (Formerly Express Scripts Holding Co.) & Subsidiaries.

William McLaughlin is currently the Vice President of Information Technology within The Cigna Group. Express Scripts identified Mr. McLaughlin as a witness with knowledge of the PBM business and software development. (Def. Ex. 48, Rule 26 Disclosures.) Mr. McLaughlin was the senior leader in charge of Express Scripts' claims adjudication platform (including the Software) in 2015. (Def. Ex. 10, McLaughlin Dep. at 26:11-27:6.)

Jennifer Voorhees is a Partner at Deloitte Tax, LLP, who helped prepare Express Scripts' administrative claims for the Section 199 deduction and is an expert witness for Express Scripts in this matter. (Def. Ex. 48, Rule 26

Disclosures.)

Michelle Wales is currently a Senior Director within The Cigna Group. (Def. Ex. 48, Rule 26 Disclosures.) Express Scripts identified Ms. Wales as a witness with knowledge of software development. (Def. Ex. 48, Rule 26 Disclosures.) Ms. Wales was the leader of the engineering team. (Wales Dep. at 32:21-33:8.) The engineering team "created the Software code in 2010." (Def. Ex. 15, Wales Dep. at 33:6-8.)

Omharaisriram Gangaikondan-Iyer (Harry Ram) is currently a Senior Director within the Cigna Group (Def. Ex. 48, Rule 26 Disclosures.) Express Scripts identified Mr. Ram as a witness with knowledge of software development. (Def. Ex. 48, Rule 26 Disclosures.) Mr. Ram enhanced the functionality of an existing platform. (Def. Ex. 29, Ram Dep. at 17:19-21.)

Scott Senden was an Express Scripts Vice President of Claims Services and the manager with responsibility for the Software in 2010-2012. (Def. Ex. 13, Reichenbacher Dep. at 65:14-19; Def. Ex. 14, Senden Dep. at 24:18-25:16.) Express Scripts identified Mr. Senden as a witness with knowledge of software development. (Def. Ex. 48, Rule 26 Disclosures.)

Matt Dietrich is currently a Senior Director within the Cigna Group. (Def. Ex. 48, Rule 26 Disclosures.) Express Scripts identified Mr. Dietrich as a witness

with knowledge of client pricing. (:Pl. Ex. 48, Rule 26 Disclosures.)

Margaret Reichenbacher is a Managing Director withing the Cigna Group who leads technology teams that support claims processing and onboarding eligibility and benefits. (Pl. Ex. 13, Reichenbacher Dep. at 10:4-20.) Ms. Reichenbacher was the overall leader for core adjudication at Medco from approximately 2004 through 2011. (Pl. Ex. 13, Reichenbacher Dep. at 73:13-76:22.)

Jacob Cedergreen was Express Scripts' Vice President of Product Management in 2010-2012, and subsequently Senior Director of Market Development, and Vice President of Account Management. (Pl. Ex. 17, Cedergreen Dep. at 14:2-7.)

Shawn Haley is currently Managing Director of Audits and Strategy within the Cigna Group. (Pl. Ex. 7, Haley 30(b)(6) Dep. at 9:16-10:2.)

David Cattran was employed by SXC Health Solutions Corp. and Catamaran Corp., the owners of the RxClaim software, in 2010-2012, and has been devoted to software development projects involving RxClaim for 22 years. (Pl. Ex. 35, Cattran Dec. at ¶1-2.)

William Turner testified that Prospective Health made ProPBM software. (Pl. Ex. 41, William Turner Dep. Tr. (May 1, 2024) ("Turner Dep.") at 74:19-75:8.) Prospective Health was an independent business unit within

RelayHealth Pharmacy. RelayHealth Pharmacy had its own business units. (Id.) The RelayHealth Pharmacy business unit was the intermediary between the pharmacy and the claims processors as well as between the claims processors back to the pharmacy. (Id. at 74:6-11.)

Susan Thomas is Senior Vice President, Growth and Retention at Elixir Rx Solutions, LLC.  (Pl. Ex. 37, Thomas Dec. at ¶ 1-3.)She was hired on November 18, 2019, and as part of her duties at Elixir Rx Solutions, LLC, Ms. Thomas "oversee[s] the account management services for the Elixir and Laker lines of business." (ECF 85-41 (Def. Ex. 37) at ¶ 3.)

In 2010-2012, there were several RxClaim customers who licensed RxClaim for use on their own servers. Those companies either were in the business of providing pharmacy benefit management services or were insurance companies that managed their own pharmacy benefit plan offerings. (Def. Ex. 35, Cattran Dec. at ¶ 4.)

Express Scripts' calculation of DPGR includes receipts it claims it derived from "drug compounding activities." (Def. Ex. 1, Express Scripts' Revised Responses to the United States' First Set of Requests for Admission, RFA #85.) Specifically, Express Scripts claims that it derived the following amounts of DPGR from drug compounding activities: $3,928,540 in 2010, $3,548,778 in 2011, and $2,394,704 in 2012. (Def. Ex. 38, Deloitte Report at 37.) Express Scripts'

complaints in this matter made no reference to drug compounding activities. (ECF 1.) Express Scripts disclosed no witnesses in discovery who have personal knowledge of its drug compounding activities. (Def. Ex. 48, Express Scripts' Second Supplemental Rule 26(a) Disclosures.)

On February 24, 2025, the Court granted Defendant's Motion to Partially Dismiss Plaintiffs' Claims for Lack of Jurisdiction., (Opinion, Memorandum, and Order, ECF 139). Express Scripts sought to claim refunds for rebates and manually entered mail order claims. The Court concluded that these items were barred based on the substantial variance doctrine. Accordingly, this Opinion does not address Express Scripts' claim for refunds on these items.

Defendant moves for summary judgment on the remaining claims arguing Express Scripts did not derive any Domestic Production Gross Revenue ("DPGR") from its software. Express Scripts claims its Plan Sponsors contracted with Express Scripts to lease, rent, license or otherwise dispose of the Software thereby generating qualifying DPGR for which Express Scripts is entitled to refunds.

Legal Standard

The standard applicable to summary judgment motions is well-settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment if all of the information before the court shows "there is no genuine [dispute] as to any material fact and the moving party is entitled to

judgment as a matter of law." See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The initial burden is placed on the moving party. *City of Mt. Pleasant, Ia. v. Associated Elec. Co op., Inc*., 838 F.2d 268, 273 (8th Cir. 1988) (the moving party has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in its favor).  Once this burden is discharged, if the record shows that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on a material factual issue. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).

Once the burden shifts, the non-moving party may not rest on the allegations in his pleadings but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(c); *Herring v. Canada Life Assur. Co*., 207 F.3d 1026, 1030 (8th Cir. 2000); *Allen v. Entergy Corp*., 181 F.3d 902, 904 (8th Cir. 1999). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).

A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Herring*, 207 F.3d at 1029 (quoting *Anderson*, 477 U.S. at 248). A party resisting summary

judgment has the burden to designate the specific facts that create a triable question of fact, see *Crossley v. Georgia-Pac. Corp.*, 355 F.3d 1112, 1114 (8th Cir. 2004), and "must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." *Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005).

Discussion

> Congress enacted section 199 as part of the American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 102(a), 118 Stat. 1418, 1424, to provide a tax deduction for certain domestic production activities. Section 199 was intended to stimulate job creation in the United States and strengthen the economy by reducing the tax burden on domestic [*30] manufacturers. See ADVO, Inc. & Subs. v. Commissioner, 141 T.C. 298, 311–12 (2013) (citing Gibson & Assocs., Inc. v. Commissioner, 136 T.C. 195, 223 (2011)). Section 199 was repealed for tax years beginning after December 31, 2017. Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, § 13305(a), (c), 131 Stat. 2054, 2126.

*Bloomberg L.P. v. Comm'r of Internal Revenue*, T.C.M. (RIA) 2024-108 (T.C. 2024).

Section 199 allowed a deduction based on receipts from qualified domestic production gross receipts, ("DPGR"), Allocable costs and expenses are subtracted from the DPGR to reach Qualifying Activities Income, ("QPAI"). Generally, the deduction is equal to 9% of the lesser of the QPAI or the taxpayer's total taxable income. The amount of the deduction must be calculated by determining the amount of Qualifying Receipts derived from "any lease, rental, license, sale, exchange, or other disposition" of the taxpayer's qualifying production property.

26 U.S.C. § 199. The deduction depended on the "disposition" (§ 199(c)(4)(A)(i))

of "qualifying production property" (§ 199(c)(4)(A)(i)(I)), defined to include "any

computer software" (§ 199(c)(5)(B)). The IRS elaborated on the word

"disposition" in regulations by specifying that § 199 allows deductions based on

revenues from sales but not revenues from services. 26 C.F.R. § 1.199–

3(i)(4)(i)(A).  *Direct Supply, Inc. v. United States*, 96 F.4th 1031, 1032 (7th Cir.

2024).

Plaintiffs contended that their Software was qualifying property. Plaintiffs

analyzed its gross receipts for the relevant years, 2010, 2011, and 2012. They

classified each type of gross receipt as qualifying, (included in the DPGR),

apportionable (included in DPRG on an allocable basis), or non-qualifying (not

included in DPGR).

Express Scripts argues summary judgment must be denied because it has

established that its software falls within 26 U.S.C. § 199(c)(5), citing *Loper Bright*

*Enters. V. Raimondo*, 144 S.Ct. 2244 (2024). The determination of whether

Express Scripts is entitled to a refund, however, is not limited by *Loper*.  *Loper* did

not affect an agency's ability to exercise rulemaking authority clearly conferred by

statute. Legislative delegation of authority within reasonable bounds is permitted

and is sometimes the best reading of statutory language. Loper Bright, 603 U.S. at

395. The Supreme Court recognized that a "statute's meaning may well be that the

agency is authorized to exercise a degree of discretion." *Id*. at 394. Congress has often enacted statutes that "empower an agency to prescribe rules to 'fill up the details' of a statutory scheme." *Id*. at 394-95. "When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court. . . is, as always, to independently interpret the statute and effectuate the will of Congress." *Id*. at 395. "The Court fulfills that role by recognizing constitutional delegations" and "ensuring [that] the agency has engaged in reasoned decision-making" within the boundaries of constitutionally permissible delegation. *Id*.

The Court's analysis begins with the parties' contracts. The contracts did not set out that Express Scripts granted licenses in the software to the Plan Sponsors, the Plan Sponsors had no access to the software, and they specifically stated that claims adjudication was a service Express Scripts provided to the Plan Sponsors. Indeed, the Plan Sponsors did not originate any claims adjudication, rather, the pharmacies or the Plan Members, via the switching company, were the source of origination for all claims adjudications. While Express Scripts argues the claims adjudication was provided by the  "software," Express Scripts fails to reconcile the fact that the Plan Sponsors did not submit anything to the software to perform the claims adjudication. *Direct Supply, Inc. v. United States*, 635 F. Supp. 3d 685, 694 (E.D. Wis. 2022), aff'd, 96 F.4th 1031 (7th Cir. 2024)(Direct Supply did not charge nursing homes or suppliers any fees that were explicitly described as licensing fees

or fees charged for access to software. What Direct Supply described as
"licensing" was nothing more than providing login credentials to users Treasury
Regulations specifically identify the revenues derived from these kinds of online
services as revenues that do not qualify for the Section 199 deduction. 26 C.F.R.
1.199-3(i)(6)(ii).)

Moreover, submitting information to online software does not transform into
accessing or using the software. Compare *Direct Supply* ([T]he mere fact that
customers access Direct Supply's online software while using [its] services does
not convert the services into a provision of software for the customers' direct
use.").and *BATS Glob. Markets Holdings, Inc. & Subsidiaries v. Comm'r of*
*Internal Revenue*, 158 T.C. 118, 147 (2022), aff'd, No. 22-9002, 2023 WL
4482553 (10th Cir. July 12, 2023), (which concluded that allowing customers to
submit information to the software did not provide direct use of taxpayer's
software) with *Bloomberg,* T.C.M. (RIA) 2024-108 (T.C. 2024) (BPS customers
caused BPS to perform functions by using the analytical and graphing software.
This was not merely BPS customers accessing software to use a service; it was the
direct use of software by customers. . . BPS customers directly used BPS analytical
and graphing software to perform desired functions.")

While Express Scripts argues its contracts with J.C. Penney and Toyota
expressly grant a license or right to use the software, these contracts also expressly

44

condition any such grant with the terms "if applicable" (J.C. Penney, Def. Ex. 62 ESI-05940731 at '732) and permitting access to or use of Express Scripts System and Services "in the manner contemplated by this Agreement. (Toyota Def. Ex. 59 ESI-05944945 at '964.) Express Scripts has not cited any part of the Agreements establishing applicability of any license or use of the software.

Evidencing the software as clearly a service is the fee structure. Express Scripts charged a fee for ingredient costs, dispensing fees, and administrative fees. The ingredient costs and dispensing fees were essentially reimbursements to the pharmacies for the prescription ingredients and the dispensing of the prescription by the pharmacies. The administrative fee was payment for administrative services. There is no fee for the claims adjudication. Indeed, most of the pool contracts provide that claims adjudication services were provided at no cost. While some of the contracts did provide for an administrative fee, the administrative fee does not designate claims adjudication as included in such.

Express Scripts argues the cost of the software was included in a "bundled fee." None of the Agreements mention, let alone define a "bundled fee."  As previously stated, the ingredient costs were the costs of the ingredients in the drugs dispensed, the dispensing fee was the fee for the pharmacies to dispense the prescriptions, and the administrative fees were generally charged when the drugs were dispensed, not when the claims were adjudicated. *Direct Supply*, 96 F.4th at

1033. ("Most of the revenue that flows to Direct Supply comes from fees that are a percentage of the vendors' sales, rather than anything that measures the value of software—and neither the vendors nor the customers possess software code or a license to use any of DSSI's software. The judge likened DSSI to Amazon's system for ordering and delivering goods or the New York Times's system for providing reportage over the Internet. These systems depend on software, but they do not "dispose" of that software. Indeed, 26 C.F.R. § 1.199–3(i)(6)(ii) disallows deductions under § 199 for these kinds of activities.") Express Scripts fails to establish that it derived revenue directly from a license or other disposition of its software which would entitle it to claim qualifying receipts.

Conclusion

The Express Scripts Agreements with its Plan Sponsors specifically designate claims adjudication as a service. Express Scripts did not license or otherwise dispose of its software as set out in 26 U.S.C. § 199 and the regulations promulgated thereunder. There were no fees charged for the software. The Plan Sponsors did not access the software at any time and the limited access to Express Scripts' software was by pharmacies and Plan Members who merely input information needed for the Express Scripts to perform the service of the claim adjudication, for which the Plan Sponsors contracted. Based on the findings of undisputed material facts, Express Scripts is not entitled to the deduction provided

46

by Section 199 as a matter of law.

Accordingly,

**IT IS HEREBY ORDERED** that the United States' Motion for Summary Judgment, [Doc. No. 91], is **GRANTED.**

Conclusion

Plaintiffs' claims for the rebates and the manually entered mail order pharmacy claims are barred by the substantial variance doctrine. They rely on facts not presented to the IRS in its claims for refund. As such, they are excluded from any calculation of Plaintiffs' claims for the years 2010, 2011, and 2012.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion to Partially Dismiss Express Scripts Claims for Lack of Jurisdiction is **GRANTED.**

A separate judgment is entered this same date.

 Dated this 18th day of March, 2025.


_____
     HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE